IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LARRY R. LOPEZ,

    Petitioner,                      No. 2:07-cv-2742-MCE-JFM (HC)

    vs.

T. FELKER,

    Respondent.                 FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2004 conviction on charges of murder with discharge of a firearm and illegal possession of a firearm. This action is proceeding on petitioner's amended petition, filed February 1, 2008. Petitioner raises two claims. First, he claims that his rights under the Sixth and Fourteenth Amendments to the United States Constitution were violated by jury intimidation and tampering.[1]  Second, he claims that his right to a fair trial guaranteed by the Sixth and Fourteenth Amendments was violated by the trial court's denial of trial counsel's second request for a continuance to talk with an eyewitness.

---

[1] On May 21, 2008, petitioner filed a request to hold the instant action in abeyance to allow him to exhaust a claim of ineffective assistance of counsel arising from the same set of facts as his first claim for relief. For the reasons set forth in these findings and recommendations, petitioner's first claim is without merit. A fortiori, counsel was not ineffective in failing to move for a mistrial based on the same set of facts. Petitioner's request to hold these proceedings in abeyance should be denied.

FACTS[2]

In May 2004 Skyy Turner, her six-or seven -year-old daughter Ariana, her sister Ann Hempstad, and her cousin Kelle St. Mary lived together at a house on Belair Street in Stockton. Jackie Slade, the brother of Ariana's father (sometimes referred to as Turner's brother-in-law although it is not clear Turner was married to Ariana's father), visited the house quite often to help the family after his brother, Ariana's father, was imprisoned on federal drug conspiracy charges. Aaron Jamal Tolliver was a close friend of Slade and a friend of Turner. He also visited the house regularly. Hempstad was dating [petitioner], who was another regular visitor to the house.

[Petitioner] and Tolliver disliked each other and had fought in the past. [Petitioner] was one of the original members of and had helped form the Nightingale area Blood gang. Slade was also a Blood gang member, but Tolliver had told [petitioner] he was a member of a rival gang, the Crips. [Petitioner] and Tolliver fought previously because Tolliver disrespected [petitioner].

On May 20, 2004, [petitioner] brought Hempstad home from the hospital. She felt poorly and was drugged with pain medicine. Hempstad went inside the home and joined Turner, St. Mary, and Tolliver in watching a movie on TV.

Sometime later there was a loud noise outside. [Petitioner] was out on the front porch of the house playing dice for money with Slade. St. Mary testified Turner was irritated by the noise and went out front to tell them to leave. After Turner came back inside there was another loud noise. Tolliver told Turner he would go out front to tell them to be quiet.

According to Slade, Tolliver came outside and told them Turner wanted them to move it down the street. [Petitioner] responded that Tolliver should mind his own business because it was not Tolliver's house and he couldn't tell [petitioner] what to do. Tolliver told them again to move. [Petitioner], who was dressed in red and had a red handkerchief hanging from his pocket, was throwing dice and saying, "Blood that and Blood this and Blood that." Tolliver and [petitioner] started "backtalking" each other.

When [petitioner] crapped out with the dice, he went and socked Tolliver once in the head. Tolliver rushed [petitioner] off the porch and hit [petitioner] back harder four or five times in the face. Although Tolliver was physically smaller than [petitioner]

---

[2] The facts are taking from the opinion of the California Court of Appeal for the Third Appellate District in People v. Lopez, No. C048930 (Aug. 14, 2006), a copy of which was lodged in this record by respondent on May 15, 2008 as lodged document 6.

was, he was a good fighter and proud of it. [Petitioner] fell against the garage and to the ground. [Petitioner] tried to block Tolliver's punches but did not hit back. According to Slade, at this point, a gun [petitioner] had in the red handkerchief, fell out of [petitioner]'s pocket. [Petitioner] and Tolliver looked at the gun. Then Tolliver turned and ran. [Petitioner] picked up the gun, started chasing Tolliver and shot Tolliver. Slade heard six rapid shots. Tolliver fell to the ground, where he died.

An autopsy later showed Tolliver had been shot four times. One bullet traveled through his back into the abdominal cavity, through his liver, diaphragm, and right lung. Another bullet went into Tolliver's back, struck his spine and stopped in the spinal canal. A third bullet went into Tolliver's upper back and along the back of his left arm. The fourth bullet hit Tolliver in the head, lodging in his brain.

At the preliminary hearing, Slade testified the three women came outside after they heard the shots. At trial Slade testified Turner and St. Mary came outside in the middle of the fight. He could not remember seeing Hempstad, but thought she was there. He thought Turner and St. Mary saw the shooting. At trial Slade testified that when he saw [petitioner] start shooting, he grabbed his niece Ariana, who was standing in the doorway, and tried to duck for cover. Ariana was crying. After Tolliver fell, [petitioner] took off running.

Slade could not believe what had just happened. He did not want to watch his best friend dying, so he walked off to the store. When he came back, the police were there. Slade did not tell them what he had witnessed. In fact, Officer John Scofield testified Slade denied seeing anything, hearing anything, and said he had no idea who could have done this to his friend. Slade testified he had federal drug conspiracy charges pending against him and he feared being taken into custody. He thought his "sisters" had enough witnesses to handle the matter.

Hempstad testified all three women went outside when they heard a boom like something hitting the garage door. Hempstad saw [petitioner] and Tolliver fighting by the garage. They were both standing wrestling. [Petitioner] was over Tolliver because of their height difference. [Petitioner] was not on the ground being hit by Tolliver. Turner asked Slade if he was going to do something, but Slade said no and just stood there. Hempstad said she then saw a gun with a red rag wrapped around it fall from [petitioner]'s pocket onto the ground. She saw Tolliver turn and try to run out of the yard. [Petitioner] picked up the fun and started shooting. She thought [petitioner] fired the gun six times. Everything happened so fast.

/////

Hempstad said she was standing on the bottom step of the porch when this was happening. Turner was at the top of the porch with St. Mary, although at one point St. Mary may have gone inside to check on Ariana. Hempstad testified that she stayed outside the entire time, but then said she went inside to check on Ariana during the fighting, found her asleep, and came back outside. Hempstad testified Turner ran down to Tolliver first and she followed. Somebody called for an ambulance and the police.

St. Mary testified she and Turner went outside when they heard a thump. Hempstad came out behind St. Mary. St. Mary saw [petitioner] and Tolliver fighting. Tolliver was on top of [petitioner] punching him in the face. St. Mary turned around and went back inside to check on her niece who was asleep. Three to five minutes after St. Mary went inside she heard three to four gunshots. St. Mary ran to the front door where she saw Turner on her knees crying. Turner ran out to the yard and St. Mary ran out behind her. St. Mary saw Tolliver lying on the ground. Turner went to Tolliver, lifted his head, and tried to wake him. St. Mary called 911.

At [petitioner]'s preliminary hearing, St. Mary testified she thought Hempstad and Turner were in the living room when the gunshots rang out, but at trial, St. Mary thought Hempstad was standing in the doorway and Turner was on the porch. In the end, she was not sure where they were. At the preliminary hearing, St. Mary said after the shots Turner went out first, then Hempstad, then she followed. At trial, she thought Turner went first, then she followed and Hempstad came behind them.

Turner testified Tolliver went outside to tell the people on the porch to leave. Tolliver was outside for a while. Turner checked on Ariana, who was asleep in Turner's bedroom. Then Turner heard some banging on her front door. She and St. Mary jumped up to see what was happening. When Turner first came out of the house, she saw [petitioner] by the garage and Slade by the garbage cans, but then she focused on Tolliver who was walking really fast down the driveway. She heard shots and saw Tolliver limp, then turn like he was shot in the back, and then the third shot dropped him. [Petitioner] was behind her when she heard the shots. Turner testified it was "like something in [her[ head [told her] don't turn around, let him leave the driveway." When the shots were done, Turner saw [petitioner] scramble to pick up a red rag on the ground. She never saw a gun. After [petitioner] left the yard, Turner went to Tolliver. Turner knew St. Mary was behind her because she called for the ambulance, but Turner did not know where Hempstad was when Tolliver was shot. Slade walked out of the yard and Turner saw Hempstad walk behind him out to the gate. Turner said she never saw any fighting. Her daughter was definitely not in the doorway watching the fight.

4

>Turner told the police she did not want Tolliver at her house that day because Slade and the other guys would be there and they would argue.
>
>[Petitioner] testified on his own behalf. [Petitioner] testified he dropped Hempstad off, went home to shower and then returned to Hempstad's house, where he played dice on the front porch with Slade. [Petitioner] was dressed entirely in red, the color of the Blood gang.
>
>[Petitioner] claimed it was Slade who was upset by Tolliver coming outside and telling them to leave. [Petitioner] ignored Tolliver and continued playing dice until he heard Tolliver mutter "Slob," a derogatory term used by Crips for a Blood gang member. Tolliver had repeatedly "disrespected" [petitioner] resulting in a previous fight. [Petitioner] considered it the most important thing not to be disrespected. This time, in response, [petitioner] ran up to Tolliver and hit him in the back of the head. Tolliver and [petitioner] started fighting and they fell off the porch. Tolliver got up first and stood over [petitioner], hitting him. According to [petitioner], Slade was encouraging [petitioner] and said to him, "Get that nigger, get that nigger." Tolliver threw two punches at [petitioner] when [petitioner] was on the ground, and then turned to run. At that point, Slade fired a gun at Tolliver. [Petitioner] heard three shots and saw Slade leave down the driveway. [Petitioner] also left as he was on parole and was not supposed to be in a gang area.
>
>[Petitioner] denied having a gun and denied shooting Tolliver. When [petitioner] learned he was wanted, he arranged with the public defender's office to surrender because he had nothing to hide.
>
>[Petitioner] testified his relationship with Hempstad was up and down because she had found out he had another girlfriend.

People v. Lopez, slip. op. at 2-9.

## ANALYSIS

I. <u>Standards for a Writ of Habeas Corpus</u>

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

>(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

/////

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

II. Petitioner's Claims

   A. Jury Intimidation and Tampering

Petitioner's first claim is that his rights under the Sixth and Fourteenth Amendments were violated by jury tampering and intimidation. Petitioner exhausted this claim in petitions for writ of habeas corpus filed in the San Joaquin County Superior Court, the California Court of Appeal for the Third Appellate District, and the California Supreme Court.

See Lodged Documents 10, 13-18.  The last reasoned rejection of this claim is the decision of the San Joaquin County Superior Court, which denied the claim as follows:

> Petitioner contends that the jury in his murder case was intimidated by the victim's family.  He bases this contention on correspondence from his defense attorney which states: "The jury sent the judge a note indicating that they had a verdict.  This note also referenced a desire to be protected from the victim's family.  This note should be part of the Court File."  The court has reviewed all of the jury's verdicts and questions to the court.  The note to which counsel refers contains no mention of a desire to be protected from anyone.  [It should be noted that counsel's correspondence is dated more than two years post-trial.  It therefore appears likely that counsel was simply mistaken.]

Lodged Document 10, In the Matter of the Petition of Larry R. Lopez for Writ of Habeas Corpus, Case No. SF091998 (May 7, 2007), slip op. at 1.

The state court's factual findings are fully supported by the record.  It contains three notes from the jury, two of which read "We, the jury, have reached a verdict."[3]  Clerk's Transcript on Appeal (CT) at 196-199.  The third note reads "We would like to see the transcript of the pathologist's report (We are intere [ ...] in entry and [unclear] (trajectory) of bullet)."  Id. at 198.  None of the jury notes refer in any way to the victim's family.  Moreover, the letter from counsel to petitioner is dated December 15, 2006[4], more than two years after the October 28, 2004 verdict.  Ex. A to Amended Petition.  The state court's determination that there was no factual basis for petitioner's claim and its rejection of the claim are fully supported by the record.  The claim should be denied.

/////

/////

---

[3] Both of these notes are dated October 28, 2004; one bears the time 1:45 p.m. and the other 2:05 p.m. CT at 197, 199.  It appears that after the jury returned a verdict on counts 1 and 2 and accompanying enhancements it was instructed on a prior, retired to deliberate, and returned with a verdict on the prior.  Id. at 205-206.

[4] The letter is actually dated 15 deciembre 2006.  See Ex. to Amended Petition, filed Feb. 1, 2008.

B. Denial of Request for Second Continuance

Petitioner's second claim is that his right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, was violated when the trial court denied his trial counsel's request for a second continuance to interview an eyewitness to the shooting. Petitioner exhausted this claim in petitions for writ of habeas corpus filed in the San Joaquin County Superior Court, the California Court of Appeal for the Third Appellate District, and the California Supreme Court. See Lodged Documents 10, 13-18. The last reasoned rejection of this claim is the decision of the San Joaquin County Superior Court, which denied the claim as follows:

> Petitioner's second contention is that the trial court erred in refusing a continuance of the sentencing hearing to allow counsel to locate a potential witness regarding the identity of the shooter. The transcript reveals that the hearing took place more than two months after the trial, having already been continued over a month at defense counsel's request. There is no evidence that the trial court erred in denying a second continuance to re-visit the guilt phase of the trial, nor is there any evidence that petitioner was prejudiced by the failure to receive this unnamed witness' testimony.

Lodged Document 10, In the Matter of the Petition of Larry R. Lopez for Writ of Habeas Corpus, slip op. at 1.

The United States Supreme Court has held that "[t]he matter of continuance is traditionally within the discretion of the trial judge" and "not every denial of a request for more time . . . violates due process." Ungar v. Sarafite, 376 U.S. 575, 589 (1964). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." Id.

The instant claim arises from the following exchange on January 10, 2005, at the time set for petitioner's sentencing:

> THE COURT: Mr. Lopez. People versus Larry Lopes. Mr. Himelblau is here, Mr. Arthur is here. We put this matter on today for sentencing/possible motion.

1   　　　I didn't receive any motion papers. I did ask the clerk to contact
    to see if something was coming our way. We did not receive
2   anything.

3   　　　With regard to the issue with sentencing, are the People ready?

4   MR. HIMELBLAU: The People are ready.

5   THE COURT: Mr. Arthur, you indicated you had some comments
    on that issue.
6
　　MR. ARTHUR: I have stated that I'm not ready. I'm just going to
7   request a two-week continuance to talk to a witness in this case.

8   　　　The court remembers this case involved the testimony against
    Mr. Lopez, essentially, of the person that we accused to be the
9   perpetrator.

10  THE COURT: Ms. Slate for the record.

11  MR. ARTHUR: Yeah, the three young women. One of whom was
    heavily doped up on prescription pain medications. Another of
12  whom admitted she can't really see anything except the sequel
    because she was in the back taking care of the baby. And the third
13  one, Sky Turner, although her testimony was consistent at least
    with itself, was basically inconsistent in terms of where, and when,
14  and who was doing what with all of the other women who testified.

15  　　　Basically when the jury came out with the verdict, I thought it
    was going to be not guilty. I just didn't see how any jury can
16  possibly convict on evidence like that.

17  　　　Eventually they found something in there, but the court gave me
    a continuance – usually because I have heard a lot of talk from
18  sources that there were witnesses out there who had not been
    willing to come forward because they were, you know, frightened
19  of getting involved with the system but were not happy to find out
    their assistance would be useful.
20
　　I tracked them down and quite a few of them referred me farther
21  down the line until finally I came up with a gentleman who claims
    to be an eyewitness.
22
　　My investigator only talked to him and made her report last
23  Friday. I got it about 11 o'clock. It wasn't time enough for me to
    schedule an in-person visit, because it takes a 24-hour notice. And
24  obviously I want to talk to this guy and find out if he appears to be
    an honest witness telling the truth as best he proceeds [sic] it,
25  because if he wasn't I would just give him the back of my hand and
    move on.
26

9

If he is telling the truth, he appears to be an eyewitness and I read to the court and counsel in chambers it's a kind of prestige of his information. And he claims to have been sitting there in his car having some lunch and waited to visit with some people there. He was to have seen the whole thing, and he describes Jackie Slate as the shooter.

I think this is information which we clearly did not have the opportunity to present. It's clearly relevant and germane, and would substantially or had potential to substantially alter the jury verdict.

I think we should have a chance to investigate that and put that before the court in the form of a motion for a new trial.

THE COURT: Any thoughts you have on that request, Mr. Himelblau?

MR. HIMELBLAU: We would object on the following grounds. My understanding is this motion is not written or made orally as based on discovery of new evidence and not sufficient of the evidence.

Mr. Arthur is relitigating the facts of the case, not withstanding we have had this case in the system for approximately six to eight months. The trial occurred two months ago. Mr. Arthur had been given an extra month to investigate the claims.

I didn't think there would be a single witness brought forward today when the original motion was made. There are no other witnesses out there. There is no person who saw it. This individual that Mr. Arthur is speaking about was sitting in the jail. There has been plenty of time to get ahold of this person.

Mr. Arthur and his client had the opportunity to present this witness, because they have had the time to find him. And everybody in the neighborhood knows what happened because everybody in the neighborhood was either a witness to what had happened or saw the aftermath of what had happened.

. . . .

THE COURT: I'd be inclined to rule on the request.

I'm going to deny the request for the following: This case had a lengthy discovery period. The trial ended on or around late October 28th, 29th. We put the sentencing over to December 6th, meaning there was time in there to investigate these additional matters.

/////

10

> On December 6th we were in the same posture, Mr. Arthur requesting time because there may be additional exculpatory witnesses. To the DA objecting, I allowed the continuance over until today, so that's an additional month and a few more days, and I'm going to find sufficient time has been given to investigate all these matters.

Ex. B to Amended Petition, Reporter's Transcript of Proceedings (RT) at 502-505. Following imposition of sentence, the court made the following observation:

> I know you can test the jury's decision in this case, Mr. Lopez. It was apparent throughout the whole trial, neither side knew the shooter in this case. You do have a right to appeal, you know that, and you have a right to file a writ on this issue of possible new evidence.

RT at 515.

The trial court's decision not to continue the sentencing hearing further did not violate petitioner's federal constitutional rights. As the trial court noted and the state superior court found, the trial court initially set the sentencing hearing for more than a month after the end of trial, and then continued it for an additional month at defense counsel's request. At the sentencing hearing, trial counsel explained what the potential witness claimed to have seen but also stated that he had to determine whether the witness was credible. Id. at 503. Moreover, the trial court advised petitioner that he had the right to "file a writ on this issue of possible new evidence." Id. There is no evidence in the record of any further interview with the potential witness nor has petitioner tendered an affidavit from that witness. For both of these reasons, there is no evidence that petitioner was prejudiced by the denial of the continuance. For all of the foregoing reasons, this court finds that the trial court's denial of the request for continuance did not violate petitioner's constitutional rights and the state superior court's rejection of this claim

/////
/////
/////
/////

was neither contrary to nor an unreasonable application of clearly established federal law.[5] This claim should be denied.

Finally, on July 31, 2009, petitioner filed a document styled as a motion for entry of judgment by which he seeks clarification of the status of the instant action. The motion is mooted by these findings and recommendations and will be denied.

In accordance with the above, IT IS HEREBY ORDERED that petitioner's July 31, 2009 motion is denied; and

IT IS HEREBY RECOMMENDED that:

1. Petitioner's May 21, 2008 request to hold this action in abeyance be denied; and

2. Petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that

/////
/////
/////
/////
/////
/////

---

[5] In the answer, respondent contends, inter alia, that there is no clearly established precedent from the United States Supreme Court concerning the right to a post-trial continuance and that this claim "is foreclosed by the non-retroactivity principle set forth in *Teague v. Lane*, 489 U.S. 288 (1989)" because at the time petitioner's conviction became final there was no "rule requiring a court to grant a post-trial continuance to enable the defense to locate a potential witness." The court does not reach either of these arguments

1  failure to file objections within the specified time may waive the right to appeal the District
2  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).
3  DATED: August 18, 2009.

 _____
 UNITED STATES MAGISTRATE JUDGE

12
lope2742.157